JACK SMITH AND ROSE MAE SMITH, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63284. Filed September 23, 1959.

*Henry C. Diehl, Esq.*, and *Charles E. Horning, Jr., Esq.*, for the petitioners.

*Richard W. Janes, Esq.*, and *Cyrus A. Johnson, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioners' income tax for the years 1952 and 1953 in the amounts of $13,950.43 and $6,936.92, respectively.

The issue is whether respondent was correct in not recognizing as partners in the Boston Shoe Company, the trustees of certain trusts created by the petitioners for the benefit of their two children.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

Petitioners, Jack Smith and Rose Mae Smith, his wife, sometimes hereinafter referred to as Jack and Rose, reside in Beverly Hills, California. They filed their joint income tax returns for the years in question with the district director of internal revenue at Los Angeles, California. Prior to their marriage in 1931, Jack operated a wholesale shoe distributing company called the Boston Shoe Company as an individual proprietorship. After their marriage, the Smiths considered the business was community property to which the husband's earning capacity contributed. On December 31, 1942, Jack bought out Rose's interest for the sum of $102,933.89, giving her a series of promissory notes totaling said sum.

On September 29, 1943, Jack and Rose created, by written instruments, two trusts for the benefit of their children, Howard, then aged eleven, and Barbara, then aged three. Rose was trustee of the Howard Smith Trust and Jack was trustee of the Barbara Smith Trust. On the same day Jack assigned to Rose, trustee of the Howard Smith Trust, bonds totaling $30,000, and Rose assigned to Jack, trustee of the Barbara Smith Trust, Jack's $30,000 promissory note, which he had given to her as one of the series of notes the previous December. Also on the same day Rose purchased from Jack an undivided 30 per cent interest in the business and assets of the Boston Shoe Company, giving in exchange therefor two of Jack's $30,000 promissory notes, which were also in the series of notes given to Rose the previous December. The next day the trusts exchanged their assets for 15 per cent each in the Boston Shoe Company and simultaneously a partnership agreement was executed wherein all of the owners of the individual interests in the Boston Shoe Company contributed such interests to the partnership. The partnership was a general partnership which was to continue for a period of 20 years unless sooner terminated.

The partners and their interests in the Boston Shoe Company were as follows:

| Partner | Interest (per cent) | Amount |
|---------|---------------------|--------|
| Jack | 40 | $80,000 |
| Rose | 30 | 60,000 |
| Jack, trustee for Barbara Trust | 15 | 30,000 |
| Rose, trustee for Howard Trust | 15 | 30,000 |

The trusts were made irrevocable and they gave the children a graduated right to the distribution of the corpus; one-fourth upon reaching the age of 25, one-fourth at age 30 and the balance at age 35.

The partnership agreement gave Jack a salary of $25,000 per year and Rose a salary of $2,400 per year and the net proceeds of the business were to be distributed in accordance with the capital ownership. Jack and Rose were to be the main partners and Jack was made the managing partner with broad powers to conduct the business of the partnership.

Shortly thereafter the fact that the Boston Shoe Company had commenced to operate as a partnership with the trusts as owners of partnership interests was made known to Dun & Bradstreet and to creditors and customers of the Boston Shoe Company and to the bank with which the partnership did business.

Certificates of doing business under a fictitious name were filed and published in 1943 and 1945 as required by California law. These certificates showed that the trusts owned interests in the Boston Shoe Company.

For a time between 1945 and 1948 a key employee named Weishaupt was a 10 per cent partner. His partnership interest was derived from 10 per cent reduction of each of the other partners' interests. When he dropped out in June 1948, the partnership continued as before.

For the years 1943 to 1948, inclusive, the Commissioner determined that the trusts were not to be recognized as partners in the Boston Shoe Company and the trust income derived from the partnership was attributable to Jack and Rose Smith and deficiencies were accordingly determined against Jack and Rose. They paid the deficiencies and, after denial of their claims for refund, brought suit for refund in the United States District Court, Central Division, of the Southern District of California. The judgment in the case rendered August 23, 1954, was for the Commissioner, the Court holding the Commissioner was correct in disregarding the trusts as partners. *Smith* v. *Westover*, 123 F. Supp. 354.

The decision of the District Court case, *Smith* v. *Westover*, *supra*, was affirmed on appeal to the United States Court of Appeals for the Ninth Circuit, *Smith* v. *Westover*, 237 F. 2d 201.

The trust and partnership agreements, together with the other instruments previously referred to herein, are the same as the trust and partnership agreements and other instruments in effect between the parties in the previous case of *Smith* v. *Westover, supra.*

By an agreement dated December 11, 1950, between the partners it was agreed that donations to charities by the partnership were not to be charged to the trusts' shares of profits. The partnership returns for the years ending January 31, 1952, and January 31, 1953, show charitable donations in the sums of $9,812.25 and $10,095.34, respectively. These entire charitable contributions were taken as deductions by petitioners in their 1952 and 1953 joint returns.

The partnership agreement contained provisions for earned capital accounts for the partners made up of net profits allocated to the partners but not distributed. However, during the entire life of the partnership substantial sums were withdrawn by all the partners and the funds withdrawn by the trusts were invested in income-producing properties not related to the Boston Shoe Company business, such as savings accounts, Government bonds, and land ventures.

By the end of 1952 the Howard Smith Trust had a net worth of $71,086.34, of which only $36,008.72 was represented by the trust's capital account in Boston Shoe Company; by the end of 1953, its net worth was $74,041.70, of which only $36,008.72 was represented by its partnership capital account. By the end of 1956 the net worth of the trust exceeded the trust investment in the Boston Shoe Company partnership by $54,693.74.

By the end of 1952 the Barbara Smith Trust had a net worth of $79,144.29, of which only $41,778.50 was represented by the trust's capital account in Boston Shoe Company; by the end of 1953, its net worth was $82,154.21, of which only $41,778.50 was represented by its partnership capital account. By the end of 1956, the net worth of the trust exceeded the trust investment in the Boston Shoe Company partnership by $63,685.40.

No trust funds were ever withdrawn or used by petitioners for the support or education of either of their children.

In 1957, when Howard became 25, there was distributed to him the sum of $33,077.80, in accordance with the terms of his trust.

After the decision in the Court of Appeals in *Smith* v. *Westover, supra,* Jack and Rose Smith, as individuals, entered into a written agreement (dated January 2, 1948) with Jack and Rose as trustees wherein it was provided the two trusts would pay to petitioners sums equal to the amount of taxes petitioners paid or would have to pay in the future by reason of the trusts being not recognized as partners. Pursuant to the terms of this agreement the Howard Trust paid to Jack $37,289.73 and the Barbara Trust paid to Rose $31,480.20.

In 1956 the Boston Shoe Company was incorporated, with all partners, including the trusts, receiving stock in proportion to their capital ownership in the partnership, i.e., Jack 40 per cent, Rose 30 per cent, and each trust 15 per cent.

The Boston Shoe Company kept its books and filed its partnership returns on a fiscal year basis ended January 31. During the year 1952 the Howard Trust and the Barbara Trust each reported partnership income in the sum of $9,829.15. During the year 1953 the Howard Trust and the Barbara Trust each reported partnership income in the sum of $5,218.75. Said amounts in each case represent 15 per cent of the partnership net profits for the fiscal years ended January 31, 1952, and January 31, 1953. The deficiencies here involved result from respondent increasing petitioners' partnership income by the amounts reported by the trusts as set forth above.

As of January 31, 1952, the Boston Shoe Company carried an inventory of $308,051.73 and on January 31, 1953, it carried an inventory of $290,820.10. It carried receivables in excess of $170,000 for each of said years. On the average, the Boston Shoe Company had about $367,000 per year tied up in inventory and receivables over a 13-year period.

During the years in question and at all times material herein, capital was a material income-producing factor in the business of the Boston Shoe Company.

The Boston Shoe Company was, during the years in question, a valid family partnership, for income tax purposes, in which the Howard Smith Trust and the Barbara Smith Trust each owned a 15 per cent capital interest.

OPINION.

Respondent argues petitioners are collaterally estopped to assert the trusts should be recognized as partners for Federal income tax purposes, during 1952 and 1953, because of the case of *Smith* v. *Westover*, 123 F. Supp. 354, affd. 237 F. 2d 201. The cited case held the trusts should not be recognized as partners for Federal income tax purposes for the years 1943 through 1948.

In tax cases involving income taxes in different taxable years, a judgment on the merits operates as an estoppel to any subsequent proceeding in a different taxable year between the same parties where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remained unchanged. *Commissioner* v. *Sunnen*, 333 U.S. 591. In the cited case the Supreme Court warned that tax inequality can result by the application of collateral estoppel if factual changes or a change or development in the controlling legal principles has intervened, and the opinion states:

It naturally follows that an interposed alteration in the pertinent statutory provisions or Treasury regulations can make the use of that rule [collateral estoppel] unwarranted. * * *

Petitioners admit that the facts with regard to the creation of the trusts and the formation of the partnership have not changed since the earlier litigation. They argue the same facts there presented, plus new facts and circumstances, occurring since that litigation and designed to show the reality of the trusts' ownership of capital interests in the partnership, preclude the application of the doctrine of collateral estoppel. They also argue that there has been a change in the law by the enactment of section 340, Revenue Act of 1951,[1] as an amendment to the Internal Revenue Code of 1939, pertaining to family partnerships.

We agree with petitioners that this is not a case for the application of the doctrine of collateral estoppel. Petitioners are not precluded by the judgment in *Smith* v. *Westover, supra*, where it was held that the Commissioner was correct in not recognizing the trusts as partners for the years 1943 to 1948, inclusive, from again liti-

---

[1] SEC. 340. FAMILY PARTNERSHIPS.

(a), DEFINITION OF PARTNER.—Section 3797(a)(2) is hereby amended by adding at the end thereof the following: "A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person."

(b) ALLOCATION OF PARTNERSHIP INCOME.—Supplement F of chapter 1 is hereby amended by adding at the end thereof the following new section:

"SEC. 191. FAMILY PARTNERSHIPS.

"In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service. For the purpose of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be donated capital. The 'family' of any individual shall include only his spouse, ancestors, and lineal descendants, and any trust for the primary benefit of such persons."

(c) EFFECTIVE DATE.—The amendments made by this section shall be applicable with respect to taxable years beginning after December 31, 1950. The determination as to whether a person shall be recognized as a partner for income tax purposes for any taxable year beginning before January 1, 1951, shall be made as if this section had not been enacted and without inferences drawn from the fact that this section is not expressly made applicable with respect to taxable years beginning before January 1, 1951. In applying this subsection where the taxable year of any family partner is different from the taxable year of the partnership—

(1) if a taxable year of the partnership beginning in 1950 ends within or with, as to all of the family partners, taxable years which begin in 1951, then the amendments made by this section shall be applicable with respect to all distributive shares of income derived by the family partners from such taxable year of the partnership beginning in 1950, and

(2) if a taxable year of the partnership ending in 1951 ends within or with a taxable year of any family partner which began in 1950, then the amendments made by this section shall not be applicable with respect to any of the distributive shares of income derived by the family partners from such taxable year of the partnership.

gating the question for the years 1952 and 1953. The last clause of the amendment making it applicable to years after December 31, 1950, and warning against drawing inferences because it was not made applicable to earlier years shows quite clearly that Congress did not consider the family partnership provisions of the 1951 amendment to be a mere restatement or codification of existing law. See S. Rept. No. 781, 82d Cong., 1st Sess., 1951-2 C.B., pp. 458, 487.

Prior to January 1, 1951, the law applicable to family partnerships was to be found in a series of cases of which *Commissioner* v. *Culbertson*, 337 U.S. 733, was the last pronouncement of the Supreme Court of the United States. It would serve no useful purpose to make a detailed examination of all of the case-made law governing family partnership cases and state the governing law we draw from the authorities. It is enough to state that there was much lack of harmony in the opinions. Indeed, the legislative history of section 340, Revenue Act of 1951, shows Congress felt that in this area there was confusion in the law. H. Rept. No. 586, 82d Cong., 1st Sess., 1951-2 C.B. 357, 380-381. In *Henry S. Reddig*, 30 T.C. 1382, we set forth much of this legislative history and stated it showed that the Congressional intent, in enacting the said section 340, was "to settle this confusion." This alone would be sufficient to preclude the application of the doctrine of collateral estoppel here for certainly a statute which is designed to make clear the governing rules of law that have prior thereto rested in confusion, is a sufficient "change or development in the controlling legal principles," within the doctrine of *Commissioner* v. *Sunnen, supra.*

Added to the law, we now have the regulation of Commissioner (Regs. 118, sec. 39.191-1(b)) applicable to the family partnership problem for the years beginning after December 31, 1950. And this regulation makes special mention of the situation where the alleged partner is a trust. Regs. 118, sec. 39.191-1(b)(7). See *Henry S. Reddig, supra*, where portions of the cited regulations are set forth.

We are of the opinion the legal principles controlling family partnership situations were changed by the 1951 amendment and the Commissioner's regulations thereunder and these changes are sufficient, at least, to prevent the application of the doctrine of collateral estoppel.

In addition to the changes in the governing law we do have new evidence of facts, not before the Court in the prior case, which has particular significance on the partnership issue to be decided now under the law and the regulations for the years after December 31, 1950. Moreover, some of the acts that occurred in prior years take on new significance in the years after December 31, 1950, when the amendment was made applicable. The record shows the partnership's bank, their customers and creditors, and Dun & Bradstreet, were all made

aware that the partnership included the trusts as partners. The certificates of doing business under a fictitious name which were filed and published as required by California law in 1943 and 1945, showed, among other things, that the trusts were participants in the business carried on under the fictitious name of Boston Shoe Company. Regulations 118, section 39.191–1(b)(7), states that, when considering whether a trustee is a partner,

if the grantor * * * is the trustee, the following factors will be given particular consideration:

(a) Whether the trust is recognized as a partner in business dealings with customers and creditors, and

(b) Whether, if any amount of the partnership income is not properly retained for the reasonable needs of the business, the trust's share of such amount is distributed to the trust annually and paid to the beneficiaries or reinvested with regard solely to the interests of the beneficiaries.

From the above it will be seen there are now new significant facts that are to be considered and old facts that are to be given "particular consideration" as bearing upon the question of whether the trusts are to be recognized as partners during the years in question. We feel this also precludes the application of the doctrine of collateral estoppel.

This leaves for consideration the question of whether the trusts are to be recognized as partners for the years 1952 and 1953. This issue is to be decided upon the record now presented and under the 1951 amendment and the Commissioner's regulation thereunder. We have found that capital was a material income-producing factor in the business of the Boston Shoe Company. We do not understand respondent to argue otherwise. In our findings we have set forth the large inventories and receivables which the business found it necessary to carry.

All of the series of interrelated transactions, consisting of the formations of the trusts, assigning assets to the trusts, transferring interests in the business to the trusts, and creating partnership capital interests in the business, amount to gifts of partnership interests in the Boston Shoe Company by petitioners to trusts for their two children. Petitioners admit this and they make no contention that the partnership interests of the trusts were created other than by gift.

The basic requirement for a completed transfer to a donee of a partnership interest that is to be recognized for tax purposes is set forth in the 1951 amendment which provides for such recognition "if he [donee] owns a capital interest." And the tests, set forth in Regulations 118, section 39.191–1, are designed to search out whether the donee actually does own the partnership interest purportedly given to him or whether the gift is a mere sham.

In *Henry S. Reddig, supra,* we said:

The gift or sale of the partnership interest is not to be a "mere sham." It must be a bona fide gift or transfer and because it is a family transaction there must be close scrutiny. It is not to be recognized as a family partnership if, after the gift or sale, the transferor retains so many of the incidents of ownership that he will continue to be recognized as a substantial owner of the interest which he purports to have given away as was held by the Supreme Court in an analogous trust situation involved in the case of *Helvering* v. *Clifford*, 309 U.S. 331. In determining the bona fides of the gift or sale, all of the facts and circumstances at the time of the transfer and during the periods before and after it may be considered.

Respondent argues the retention of control over the interests purportedly given to the trusts can be found in the trust instruments, partnership agreement, and other documents and it is also revealed by the conduct of the parties. The documents were legally sufficient to accomplish the gifts. It is true the partnership agreement gave broad management control to Jack and the capital ownership of Jack and Rose together gave them a dominant interest in the partnership. However, it seems quite normal that petitioners, who ran the business, and especially Jack, who had started it, should have superior management control. The mere fact that the trusts had a minority voting position does not mean the donors retained control over the donated interests. We have not set forth the documents, but insofar as they speak for themselves, each establishes its own validity on its face. Respondent admits the validity of the trusts and recognizes them as taxable entities. Respondent does not assail the sufficiency of the partnership instrument to create a partnership at least as to Jack and Rose. As stated, we do not think the mere presence in the partnership agreement of clauses giving Jack superior management control should mean the trusts should be excluded. We do not find anything in the instruments providing retention of control by the donor sufficient to show the donees were not the real owners of the partnership interests.

The reality of the donees' ownership of interests in the partnership is not established by the legal sufficiency of the instruments of gift and partnership. In these family partnership cases the donor parents often are, as respondent suggests in the instant case, in a position to impose their will as parents, and reduce what appears to be a gift, to a mere sham. This is especially true when the donees are young children. The conduct of the parties is to be closely scrutinized to see if the parents treated all the related transactions as creating, in reality, bona fide gifts of the partnership interests. Here the record shows the parents' general recognition of the trusts as owners of partnership interests; their disclosure to the partnership customers,

creditors, and bank that the trusts were partners; the fact that they filed notice under fictitious name statutes that the trusts were partners; a recognition of the trusts as partners in the partnership returns; the proper distribution of the partnership profits to the trusts as partners; and, finally, recognition of each trust as owner of a 15 per cent capital interest in the 1956 incorporation of the partnership business where each trust received a 15 per cent stock interest.

Respondent points to petitioners' acts in having the partnership's donations to charities charged to their shares of partnership profits so they could take the deductions on their individual income tax returns, as showing retention of control. We fail to see how such acts demonstrate any nonrecognition of the trusts as partners.

The conduct of petitioners with respect to the trusts is also to be examined. Here the record shows the trust funds were invested in bonds, savings and loan associations, and real estate ventures. Trust funds were not spent for the support or education of the children. Partial distribution was made to Howard when he reached 25 years of age, as the trust provided.

Respondent points to the petitioners' acts in causing the payment by the trusts to themselves of the net deficiencies resulting from the nonrecognition of the trusts as partners. It may be that the action of having the trusts pay the deficiencies resulting from their nonrecognition as partners, was invalid. Perhaps in a proper action the trustees could be made to account for these expenditures. We need not decide this, however, for we are only examining the conduct of petitioners to see if it amounts to diverting the trust property for petitioners' benefit, in a manner which would indicate retention of control over the gift. When so viewed, we do not feel such conduct warrants a conclusion that petitioners were retaining control of the donated partnership interests for their own benefit. The fact remains that the income on which the tax was based did not go to petitioners. They saw to it that it was turned over to the trusts. It is true, as respondent argues, that using trust funds to pay trustee's obligations, is generally strong evidence of retention of control over the donated property. However, under the special circumstances of these expenditures, for taxes relating to the very income the trusts actually received, we believe no conclusion of retention of control is warranted.

We hold the two trusts should be recognized as partners in the Boston Shoe Company for the years in question.

*Decision will be entered for the petitioners.*